AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico ▼

FILED

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Locations A-1 through A-6 and Target Subjects 1-6, )
all described in detail in Attatchhment A, which is )
incoporated herein by this refernce. )

Case No. **22 MR 534 – 22 MR 539**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of ____**New Mexico**____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. §§ 841(a), 843(b), 846, 856, and 18 U.S.C. §§ 922(g), 924(c), and 1962 | possession with intent to distribute controlled substances, use of a communication facility in furtherance of drug trafficking; conspiracy, maintaining drug involved premises, felon possess firearm, possess firearm in furtherance of drug trafficking, RICO Act violations. |

The application is based on these facts:

Refer to the attached 45-page Affidavit in Support of an Application for Search Warrants

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Bryan M. Acee, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
____email and telephone____ *(specify reliable electronic means)*.

Date: April 4, 2022

_____
*Judge's signature*

City and state: Albuquerque, New Mexico

Jerry H. Ritter, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A
### Person and Premises to be Searched
#### A-1

Person to be searched: **Shamon Pacheco Jr., aka: "Stunner,"** who appears in the photograph below. The Defendant will be searched for tattoos evidencing membership in or association with the Westside Locos (WSL) or any other gang. A color photograph of the Defendant follows:



Premises to be Searched: Subject Premises **A-1** is located at 240 Wheeler Ave SE, 1st floor unit A, Albuquerque, New Mexico. Subject Premises A-1 may be described as a two-story residence, divided into four units, with brown siding and brown trim. A brick and iron fence enclose the property. There are cameras positioned on all sides of the residence. The numbers 240 are posted on the mailbox in front of the residence. The letter A is posted above the front door, which consists of a white metal security door in front of a standard front door. Color photographs of the location are posted below.




The search of Subject Premises A-1 shall include the entire residence and all outbuildings, trash cans, and storage containers designated for use by the Subject Premises. The search shall also include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

Attachment A-1

**ATTACHMENT A**
**Person and Premises to be Searched**
**A-1**

Biometric Access to Devices: During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel **Shamon Pacheco Jr., aka: "Stunner,"** (hereinafter the Subject) to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

a) Any devices found at the premises, and

b) Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments

c) for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

d) This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the Subject state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

Attachment A-1

**ATTACHMENT A**
**Person and Premises to be Searched**
**A-2**

Person to be searched: **FNU LNU, aka: "JUNIOR,"** who is described as being the only occupant of the Subject Premises identified below. JUNIOR is a Hispanic, male, adult, with black hair, brown eyes, and being between 5-08 and 5-10 in height. The Defendant will be searched for tattoos evidencing membership in or association with the G-Town gang any other gang.

Premises to be Searched: Subject Premises **A-2** is located at 240 Wheeler Ave SE, 2nd story unit B, Albuquerque, New Mexico. Subject Premises A-2 may be described as a two-story residence, divided into four units, with brown siding and brown trim. A brick and iron fence enclose the property. There are cameras positioned on all sides of the residence. The numbers 240 are posted on the mailbox in front of the residence. The letter B is posted on the front door, which consists of a white door. Color photographs of the location are posted below.





The search of Subject Premises A-2 shall include the entire residence and all outbuildings, trash cans, and storage containers designated for use by the Subject Premises. The search shall also include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the

## ATTACHMENT A
### Person and Premises to be Searched
### A-2

Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

Biometric Access to Devices: During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel **FNU LNU, aka: "Junior"** (hereinafter the Subject) to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

    a. Any devices found at the premises, and

    b. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments

    c. for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

    d. This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the Subject state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

Attachment A-2

**ATTACHMENT A**
**Premises to be Searched**
**A-3**

Person to be searched: **Ray Lee Brown** who appears in the photograph below. The Defendant will be searched for tattoos evidencing membership in or association with the Los Padilla's gang or any other gang. A color photograph of the Defendant follows:



Premises to be Searched: Subject Premises **A-3** is located at 3900 Tulane Drive NE, unit 27, Albuquerque, New Mexico. Subject Premises A-3 may be described as a two-story apartment complex with tan and orange colored siding. The name of the apartment complex is listed at the entrance to the property, "Theta Apartments" with the number 3900. There are cameras positioned on all sides of the complex and one directly over Subject Premises A-3. The number 27 is posted on the front door of Subject Premises A-3. Color photographs of the location are posted below.



The search of Subject Premises A-3 shall include the entire residence and all outbuildings, trash cans, and storage containers designated for use by the Subject Premises. The search shall also include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

Attachment A-3

**ATTACHMENT A**
**Premises to be Searched**
**A-3**

Biometric Access to Devices: During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel **Ray Lee Brown** (hereinafter the Subject) to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1. Any devices found at the premises, and
2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments
3. for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.
4. This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the Subject state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

Attachment A-3

**ATTACHMENT A**
**Person and Premises to be Searched**
**A-4**

Person to be searched: **James Casady Cangro, aka: "Havic,"** who appears in the photograph below. The Defendant will be searched for tattoos evidencing membership in or association with the Soldiers of Aryan Culture (SAC) or any other gang. Color photographs of the Defendant follow:



Premises to be Searched: Subject Premises **A-4** is located at located at 3413 Ross Avenue, unit D, Albuquerque, New Mexico. Subject Premises A-4 may be described as a single story apartment complex with red brick siding. The numbers 3413 are posted at the front of the building and the letter D is posted on the front door of the residence. There are cameras positioned on all sides of the building and one next to the front door of Subject Premises A-4. Color photographs of the location are posted below.



The search of Subject Premises A-4 shall include the entire residence and all outbuildings, trash cans, and storage containers designated for use by the Subject Premises. The search shall also include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

Attachment A-4

**ATTACHMENT A**
**Person and Premises to be Searched**
**A-4**

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel **James Casady Cangro, aka: "Havic"** (hereinafter the Subject) to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

    a.  Any devices found at the premises, and

    b.  Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments

    c.  for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

    d.  This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the Subject state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**ATTACHMENT A**
**Person and Premises to be Searched**
**A-5**

<u>Person to be searched:</u> **Larry Dwayne Daugherty, aka: "Gunner,"** who appears in the photograph below. The Defendant will be searched for tattoos evidencing membership in or association with the Aryan Warriors (AW) gang or any other gang. A color photograph of the Defendant follows:



<u>Premises to be Searched:</u> I am aware Larry Dwayne Daugherty, aka: "Gunner," is an inmate at the Northeastern New Mexico Correctional Facility in Clayton, New Mexico (Subject Premises A-5). NMCD officials have confirmed Daugherty is currently living in housing unit 1, pod A-204. NMCD officials will assist the FBI in serving the search warrant on Daugherty's prison cell and property within the cell.

Attachment A-5

**ATTACHMENT A**
**Person and Premises to be Searched**
**A-6**

Person to be searched: **Steven Michael Pannhorst, aka: "Chaos,"** who appears in the photograph below. The Defendant will be searched for tattoos evidencing membership in or association with the 23 Boyz gang or any other gang. A color photograph of the Defendant follows:



Premises to be Searched: I am aware that Steven Michael Pannhorst, aka: "Chaos," is an inmate at the Metropolitan Correctional Center in Albuquerque, New Mexico (Subject Premises A-6). MDC officials have confirmed Pannhorst is currently living in housing unit Fox 6, cell 14. MDC officials will assist the FBI in serving the search warrant on Pannhorst's jail cell and property within the cell.

Attachment A-6

**ATTACHMENT B**
**Items to be Seized**

**Items to be seized:** All for evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a) possession with intent to distribute controlled substances; 21 U.S.C. § 843(b) use of a communication facility in furtherance of drug trafficking; 21 U.S.C. § 846 conspiracy to distribute controlled substances; 21 U.S.C. § 856 maintaining drug involved premises; 18 U.S.C. § 922(g)(1) being a prohibited person in possession of a firearm or ammunition; 18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime; and 18 U.S.C. § 1962 Racketeer Influenced and Corrupt Organizations Act (RICO) to include the following items:

1. Evidence of membership or affiliation with the 23 Boyz, Soldiers of Aryan Culture (SAC), Aryan Warriors (AW), Aryan Brotherhood (AB), and Albuquerque based Westside Locos (WSL) and Los Padillla's (LP) gangs, to include any documents, photographs, drawings, writings, or objects depicting gang members names, initials, logos, monikers, slogans, or any item depicting potential gang membership, affiliation, activity or identity; "green light" lists, murder/assault lists, witness or confidential informant lists, inmate lists, address and telephone number lists, letters, law enforcement reports, jail or department of corrections reports, judgments, pre-sentencing reports, newspaper articles, computer generated reports or printouts, legal documents, detention facility inmate number lists or addresses for inmates or detention facilities;

2. Any writings, notations, photographs, addresses, maps, telephone numbers, vehicle or home descriptions, or other personal information pertaining to any actual or perceived witness, victim, informant, cooperating defendant, law enforcement officer, government attorney, or judge, or relative of any of the aforementioned persons, that were related to the racketeering investigation of the 23 Boyz, SAC, AW, AB, WSL, and LP.

3. Firearms, magazines, and ammunition;

4. Controlled substances, drug packaging material, paraphernalia, and scales;

5. Documentary evidence of drug trafficking, to include records, receipts, notes, ledgers, money orders money order receipts, pre-paid money cards such as MoneyPak, Green Dot, Wal-Mart, or other debit cards and any documents relating to transporting, ordering, purchasing or distributing drugs;

6. United States currency;

7. Cellular telephones;

8. Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys;

9. Safes, combinations or key-lock strong boxes or other secure storage containers, and types of locked or containers, and hidden compartments that may contain any of the foregoing.

Attachment B

## SEARCH WARRANTS

| SUBJECT PREMISES | TARGET SUBJECT | ADDRESS |
|---|---|---|
| A-1 | SHAMON PACHECO Jr., aka: "STUNNER" | 240 Wheeler Ave SE, 1st floor unit A, Albuquerque, New Mexico |
| A-2 | FNU LNU, aka: "JUNIOR" | 240 Wheeler Ave SE, 2nd story unit B, Albuquerque, New Mexico, |
| A-3 | RAY LEE BROWN | 3900 Tulane Drive NE, unit 27, Albuquerque, New Mexico |
| A-4 | JAMES CASADY CANGRO, aka: "HAVIC" | 3413 Ross Avenue SE, unit D, Albuquerque, New Mexico |
| A-5 | LARRY DWAYNE DAUGHERTY, aka: "GUNNER" | Northeastern New Mexico Correctional Facility, 185 Dr. Michael Jenkins Rd., Unit 1, Pod A-204, Clayton, New Mexico |
| A-6 | STEVEN MICHAEL PANNHORST, aka: "CHAOS" | Bernalillo County Metropolitan Detention Center, 100 Deputy Dean Miera Dr. SW, Unit Fox 6, cell 14, Albuquerque, New Mexico |

## GLOSSARY OF KEY TERMS AND ENTITIES

| | |
|---|---|
| AB | Aryan Brotherhood prison gang. |
| Blues | Blu eM30 pills containing fentanyl. |
| BOP | United States Bureau of Prisons. |
| CHS | Confidential Human Source, CHS for both plural and singular. |
| Drop-out | To renounce the gang, which usually includes formal debriefing with corrections staff or law enforcement. |
| DTO | Drug trafficking organization. |
| G Town | A security threat group, comprised of street gang members from Glendale, Arizona, who band together for protection in prison and jail. |
| Greenlight | To authorize violence against a person or group. |
| Hitter | A person who is able to get drugs into a correctional facility. |
| MDC | Bernalillo County Metropolitan Detention Center in Albuquerque, NM. |
| NENMCF | Northeastern New Mexico Correctional Facility in Clayton, NM. |
| NMCD | New Mexico Corrections Department. |
| Paperwork | Police reports or other discovery documents showing a person cooperated with law enforcement. |
| Put in work | To do something for the gang. |
| RICO | Racketeering Influenced and Corrupt Organizations. |
| SAC | Soldiers of Aryan Culture prison gang. |
| Shank | A clandestine knife or stabbing instrument. |
| Shot-caller | An influential gang leader, someone with authority to Greenlight. |
| SNM | Syndicato de Nuevo Mexico, a New Mexico based prison gang. |
| STIU | Security Threat Intelligence Unit. STIU officers monitor prison gangs. |
| Trigger Boys | Arizona based prison gang. |
| USP | United States Penitentiary. |
| USPO | United States Probation Office. |
| Validation | The process used by prison officials to recognize and designate an inmate officially as a member of a gang. Not all gang members have been validated. |
| WSL | Westside Locos Albuquerque street gang. |
| 23 Boys | White Boys, an Arizona white power gang. "W" is the 23rd letter in the alphabet. |

## **AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

1.      I, Bryan M. Acee, Special Agent of the Federal Bureau of Investigation (FBI), being first duly sworn, make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following premises (hereinafter referred to as the "Subject Premises") and persons (hereinafter referred to as the "Target Subjects"):

### **Subject Premises**

**A-1**     240 Wheeler Ave SE, 1st floor unit A, Albuquerque, New Mexico

**A-2**     240 Wheeler Ave SE, 2nd story unit B, Albuquerque, New Mexico,

**A-3**     3900 Tulane Drive NE, unit 27, Albuquerque, New Mexico.

**A-4**     3413 Ross Avenue SE, unit D, Albuquerque, New Mexico.

**A-5**     Northeastern New Mexico Correctional Facility, Housing Unit 1, Pod A-204, 185 Dr. Michael Jenkins Road, Clayton, New Mexico.

**A-6**     Bernalillo County Metropolitan Detention Center, Albuquerque, New Mexico.

### **Target Subjects**

**Subject 1**   SHAMON PACHECO Jr., aka: "STUNNER."

**Subject 2**   FNU LNU, aka: "JUNIOR."

**Subject 3**   RAY LEE BROWN.

**Subject 4**   JAMES CASADY CANGRO, aka: "HAVIC."

**Subject 5**   LARRY DWAYNE DAUGHERTY, aka: "GUNNER."

**Subject 6**   STEVEN MICHAEL PANNHORST, aka: "CHAOS."

2.      More detailed descriptions and photographs of the Subject Premises and Target Subjects are contained within "Attachment A," which has been attached hereto and incorporated herein by reference.

**PURPOSE OF THE AFFIDAVIT**

3.    This affidavit is submitted in support of six warrants to search the Subject Premises, which are believed to contain evidence of conspiracies to distribute methamphetamine, fentanyl, and other controlled substances; unlawful firearms possession; firearms trafficking; and racketeering. All of which are being investigated by the FBI. I believe said items constitute evidence of violations of federal law, to include:

    a.  21 U.S.C. § 841(a) possession with intent to distribute controlled substances;

    b.  21 U.S.C. § 843(b) use of a communication facility in furtherance of drug trafficking;

    c.  21 U.S.C. § 846 conspiracy to distribute controlled substances;

    d.  21 U.S.C. § 856 maintaining drug involved premises;

    e.  18 U.S.C. § 922(g)(1) being a prohibited person in possession of a firearm or ammunition;

    f.  18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime;

    g.  18 U.S.C. § 1962 Racketeer Influenced and Corrupt Organizations Act (RICO)

4.    The specific premises to be searched have been described in Attachment A, which has been attached hereto and incorporated herein by reference. The particular evidence, fruits, and instrumentalities to be seized by law enforcement are set forth in Attachment B, which has been attached hereto and incorporated herein by this reference.

5.    This affidavit also seeks the Court's permission to allow the FBI agents executing the search warrants to search the bodies of the Target Subjects for gang tattoos evidencing membership in or association with the 23 Boyz, Soldiers of Aryan Culture, Aryan Warriors, Aryan Brotherhood, Westside Locos, Los Padillas, or any other gang, and to photograph those tattoos. I believe such tattoos may constitute a conspiratorial overt act and have utilized such photographic evidence during gang-RICO jury trials in the past.

6.     I am submitting this affidavit based upon my experience and familiarity with the investigation. This affidavit does not set forth all of my knowledge or summarize all of the investigative efforts in the overall investigation; rather, this affidavit sets forth facts that support probable cause to search the requested locations and persons, as well as relevant background information. During my investigation, I have developed information I believe to be reliable from the following sources:

    a)  Information provided by the FBI, Drug Enforcement Administration, United States Marshals Service, United States Bureau of Prisons, United States Probation Office, New Mexico Corrections Department, Arizona Department of Corrections, Bernalillo County Metropolitan Detention Center, and other law enforcement or corrections officials, including oral and written reports;

    b)  Results of physical surveillance;

    c)  Information from undercover agents and Confidential Human Sources (CHS);

    d)  Information derived from consensually recorded conversations;

    e)  Information provided by cooperating defendants and/or the defense attorneys representing those persons;

    f)  Information derived from lawfully intercepted wire communications, to include telephone, text, email, and video; and

    g)  Records from the FBI National Crime Information Center (NCIC), United States District Courts, New Mexico Courts, and the New Mexico Motor Vehicle Division.

7.     Where I refer to conversations herein, they are related in substance and, in-part, based on conversations between fellow agents, task force officers, other law enforcement personnel, or CHS that assisted law enforcement. Any observations referenced herein that I did not personally witness

were relayed to me in oral and/or written reports by agents of the FBI or other agencies. All figures, times, and calculations set forth herein are approximate. Unless otherwise specified, weights of controlled substances are approximate and are based on gross measurements.

## AFFIANT'S RELEVANT TRAINING AND EXPERIENCE

8.      I have been a law enforcement officer for more than 22 years, serving as a police officer, detective, task force officer and special agent. I have been with the FBI since 2009 and am currently assigned to the investigation of Domestic Terrorism. Over the past 22 years, I have arrested several hundred persons for offenses related to drug distribution, gang crimes, racketeering offences, firearm violations, homicide, armed robbery, carjacking, assault, and other crimes. Through my training and experience, I am familiar with the methods and means used by individuals, drug trafficking organizations (DTOs), and gang/criminal enterprises to purchase, transport, store, and distribute controlled substances. I am also familiar with how those individuals and organizations hide or attempt to hide the (often substantial) profits generated from their criminal activities.

9.      I served as the lead FBI case agent in the government's 2010-2014 Continuing Criminal Enterprise Drug Kingpin Act case against the Cartel de Juarez (or Juarez Cartel), which resulted in extensive seizures of controlled substances, currency, firearms, and the indictment of multiple cartel leaders.

10.     I am the lead case agent in the government's 2015-2022 gang racketeering case against the New Mexico Syndicate (otherwise known as the "Syndicato de Nuevo Mexico" or "SNM") prison gang, which encompasses substantial drug trafficking activities, firearm-related offenses, and numerous homicides. To date, more than 160 SNM members and associates have been arrested and ten (10) cold case homicides were charged as federal racketeering murders.

11.    I have qualified, in federal and state court, as an expert witness on drug trafficking, possession with intent to distribute, and the Juarez Cartel. I have also qualified in federal court as an expert witness regarding firearms, ammunition, interstate nexus, and firearm possession as it relates to drug trafficking. I am an FBI subject matter expert on the Juarez Cartel and SNM prison gang.

12.    I have served as an adjunct professor, law enforcement instructor, and presenter on drug and gang investigations at the California Highway Patrol, Los Angeles Police Department, New Mexico State Police, and Bernalillo County Sheriff's Office academies; as well as at training classes and seminars for the Organized Crime Drug Enforcement Task Force, California Narcotic Officers Association, California Gang Investigators Association, Southern California Outlaw Motorcycle Gang Task Force, International Outlaw Motorcycle Gang Task Force, New Mexico Gang Task Force, New Mexico State University, and University of New Mexico.

13.    Based upon my training, experience, and participation in the investigation of gang/criminal enterprises and DTOs, I am aware individuals engaged in drug distribution maintain documents, letters, and records relating to their distribution activities. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends or associates, in their business locations, or in stash houses. This documentary evidence may include telephone numbers, telephone books, address books, travel receipts, records in fictitious or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as MoneyPak, Green Dot, or other debit cards, bulk United States currency, money collection logs, such as "tally" sheets, drug load sheets, or shipping/mailing receipts.

14.    I know members and associates of gang/criminal enterprises and DTOs have access to, and often utilize, numerous cellular phones, often at the same time, in an effort to avoid law

enforcement monitoring. I have observed persons involved in drug trafficking use messaging applications and pre-paid phones requiring no subscriber information, and even use fictitious names, or the names of others, to register the cellular phones used to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further illicit activities, photographs and videos of controlled substances, drug proceeds, and/or firearms. In addition, I am also familiar with the use of text messaging, instant messaging, and similar applications, used by gang/criminal enterprises and DTOs to advance their unlawful activities. I am aware such messaging applications can be utilized from computers and certain applications can send messages that appear to be cellular telephone text messages.

15.     I know that firearms are tools of the trade and instrumentalities of the crime of drug trafficking, particularly in instances involving subjects who have committed prior violent crimes and/or firearms violations. It has been my experience that criminals who illegally possess firearms often do not part with such firearms, as it may be difficult for criminals to acquire firearms. Similarly, I know firearms and other weapons are necessities for gang members.

16.     I know that individuals involved in the distribution of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports, and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so they have ready access to it and so that they can hide it from law enforcement officers. I have also observed individuals involved in drug trafficking bury evidence underground in various containers on their property. This evidence includes United States (U.S.) Currency and other valuables obtained from drug distribution.

17.     I am aware that members of gangs/criminal enterprises and DTOs often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, especially when debts remain open; the status of accounts receivable and accounts payable; the names and phone numbers of suppliers, customers, co-conspirators, and other associates who may assist drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money (U.S. Currency derived from drug trafficking), through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection of law enforcement, and any reporting requirements of banking institutions. These records can be maintained on cellular telephones, computers, and/or on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets (drug ledgers), miscellaneous notes, money orders, customer lists, and phone address books. I have personally been involved in search warrants which resulted in the discovery of such records that were more than one year old.

18.     It has been my experience that individuals involved in drug distribution possess items of identification, including but not limited to driver's licenses, rent receipts, bills, and address books. These items are relevant to the identity of the defendant(s), possessor of the items seized, and occupants of the premises searched.

19.     Lastly, it has been my experience that the items I've described herein are often stored by members of DTOs in their businesses, residences, vehicles, and surrounding garages, outbuildings, and yards, on their persons, and in the residences of friends or relatives.

## THE CONFIDENTIAL HUMAN SOURCES

20.     During the course of this investigation, FBI case agents utilized several Confidential Human Sources ("CHS" for both singular and plural reference) and undercover agents to infiltrate the Target Subjects and their criminal associates. Agents encouraged the various CHS to maintain contact with the Target Subjects who were engaged in ongoing criminal activity. Six CHS were utilized to collect information in the instant investigation. By doing so, the CHS have exposed themselves to a violent death should their identities become known. I have sought to provide the Court with some of the underlying circumstances and background information I relied upon in determining the information from the various CHS was reliable.

21.     In the paragraphs that follow, I have provided an overview of each CHS, to include:

   a)  their basis of knowledge concerning the criminal conduct;

   b)  motivation to assist the FBI;

   c)  criminal history;

   d)  any compensation received from the government; and

   e)  a statement concerning their reliability.

22.     I tried to provide sufficient information to the Court, while balancing the anonymity and safety of the CHS.

Page 10

23.     **CHS-1** is a former drug distributor and alien smuggler. CHS-1 has served time in state and

federal prison and is closely associated with the Aryan Brotherhood (AB)[1] and California Sureños

gangs.  At one time, CHS-1 distributed heroin for the California Sureños. I recruited CHS-1 as a

source of information a few years ago because CHS-1 was closely affiliated with several gang

members and drug distributors that were targets of FBI investigations. CHS-1 aided me in the

collection of evidence against members of the Surenos, Aryan Brotherhood, and other criminal

enterprises. Information provided by CHS-1 led to the issuance of 3 federal search warrants, the

arrest of three subjects on federal charges, and the recovery of firearms, ammunition, U.S. currency

and large quantities of controlled substances. CHS-1 is motivated to assist the FBI to help reduce

violent crime and drugs in the community. CHS-1 has one prior felony conviction for alien

smuggling. CHS-1 does not have any pending charges, nor has CHS-1 received financial assistance

from the FBI. I consider the information CHS-1 provided to be reliable because much of it was

corroborated through the investigation, physical and electronic surveillance, and similar source

reporting. To my knowledge, CHS-1's information has not been found to be false or misleading.

---

[1] The Aryan Brotherhood (AB) is a nationwide prison gang that strive to control drug distribution and other illegal activity within state and federal prisons. The AB was founded in 1964 at the San Quentin State Prison in California and formed by white inmates during the implementation of prison desegregation. The AB consolidated power among several white prison cliques and by the 1970s the AB had spread to state and federal prisons throughout the U.S. The U.S. Bureau of Prisons classify the AB into four distinct categories: federal AB, California AB, Texas AB, and all other states. I believe the distinction mirrors how the federal AB view the different sects of the prison gang. The AB are the most dominate white gang in America and wield control over all other white gang in prison. The federal and California AB refer to themselves as "The Brand," and all of the AB sects share common signs and symbols including the initials "AB," the numbers "666," and three leaf shamrocks. They also use Nazi symbols including swastikas and SS lightning bolts. I am aware AB membership extends beyond the prison and members on the street are required to remain loyal to the AB and to work to further the goals of the AB while in the community. The AB enforces its rules and promotes discipline among its members and associates by murdering, attempting to murder, conspiring to murder, assaulting, and threatening those who violate the enterprise's rules or pose a threat to the enterprise.

24.    **CHS-2** is a member of a white power street and prison gang, with close connections to the AB, 23 Boyz[2] and Peckerwoods.[3] CHS-2 has been incarcerated with many AB members and has served as a liaison between white and non-white gangs for the AB. CHS-2 is a former member of the Sinaloa-Phoenix-Albuquerque DTO that is detailed herein. I recruited CHS-2 as a source of information with the assistance of the Arizona Department of Corrections and FBI Phoenix Violent Gang Task Force because I was investigating drug trafficking activities between Arizona and New Mexico. CHS-2 aided me in the collection of evidence against members of the Aryan Brotherhood, 23 Boyz, G-Town, WSL and Los Padillas gangs.[4] CHS-2 previously served as an informant for an Arizona law enforcement agency. I spoke with CHS-2's former handler, who advised me information provided by CHS-2 led to the issuance of six search warrants, seizure of large quantities of drugs, and arrest of 11 persons. CHS-2 was subsequently closed by the law enforcement agency due CHS-2 recurrent drug addiction. CHS-2 is motivated to assist the FBI to help reduce violent crime and drugs in the community. CHS-2 has prior felony convictions for identity theft, robbery, and kidnapping. CHS-2 does not have any pending federal charges and has not received any financial assistance from the FBI. Although CHS-2 is an active member of a white power gang, I tend to view CHS-2 as a "citizen informant," because CHS-2 requested to

---

[2] The 23 Boyz are an Arizona based race ist prison gang that operate inside and outside prison. I believe the 23 Boyz are a criminal enterprise engaged in racketeering activities, to include murder, assault, kidnapping, robbery, firearms trafficking and drug distribution. The 23 Boyz utilize the number "23" to represent the gang. Members also display racist tattoos such as lightning bolts, swastikas, and other white power or neo-Nazi symbols.

[3] Peckerwoods are not actual members of any white prison gang; however, are subject to mandates of these gangs. In my experience, they are oftentimes the foot soldiers of these gangs.

[4] G-Town is a security threat group within the Arizona prison and jail systems comprised of street gang members from Glendale, Arizona. The Westside Locos (WSL) and Los Padillas (LP) are Hispanic street gangs in Albuquerque, NM, that primarily derive illicit income via drug trafficking.

speak with the FBI to prevent violent crime. Moreover, the information CHS-2 provided to the FBI could be viewed as a statement against interest, as CHS-2 is an active gang member and working for a violent DTO. I believe such activities could expose CHS-2 to state and federal prosecution. I consider the information CHS-2 provided to be reliable because much of it was corroborated by independent source information, other law enforcement investigations, physical surveillance, and other confidential informant reporting. To my knowledge, CHS-2's information has not been found to be false or misleading.

25.   **CHS-3** is an accomplished drug distributor in Albuquerque and previously worked for Shamon PACHECO Jr., aka: "Stunner," distributing methamphetamine and fentanyl pills. CHS-3 is not gang affiliated; however, CHS-3 has sold bulk quantities of drugs to several members of the various Hispanic street gangs in Albuquerque. CHS-3 has also sold drugs to persons who CHS-3 described as bikers and Peckerwoods. CHS-3 has pending federal drug distribution and firearm charges and has not received any financial assistance from the FBI.  I believe CHS-3 provided information to the FBI out of respect for the Bureau and the interviewing agents. CHS-3 did not request consideration in CHS-3's pending federal case; nor has CHS-3's attorney contacted FBI agents. CHS-3 has prior felony convictions for being a felon in possession of a firearm, hit and run, receiving stolen property (x2), possession of a controlled substance (x3), conspiracy to commit aggravated assault with a deadly weapon, and burglary.  At the time CHS-3 provided information to the FBI, CHS-3 was merely being detained pursuant to a federal search warrant. As such, I tend to view CHS-3 as a "citizen informant," because CHS-3 agreed to speak with me out of respect for the FBI and to prevent violent crime in Albuquerque. Moreover, the information CHS-3 provided to the FBI could be viewed as a statement against interest, as CHS-3 admitted to selling drugs for PACHECO. I consider the information CHS-3 provided to be reliable because

much of it was corroborated through law enforcement investigation, physical surveillance, and other source reporting. To my knowledge, CHS-3's information has not been found to be false or misleading.

26.     **CHS-4** is an experienced drug distributor and close associate of Larry DAUGHERTY and several other white power gang members in the Albuquerque area. CHS-4 began cooperating with the FBI about 18 months ago.  During CHS-4's period of cooperation, CHS-4 participated in several consensually recorded conversations with subjects of FBI investigations and introduced FBI and DEA undercover agents to criminal suspects. CHS-4 also utilized a cellular telephone, equipped with wire interception equipment, to converse with other FBI and DEA investigative targets. CHS-4 has been convicted of drug trafficking and aggravated assault. I consider the information CHS-4 provided to be reliable because much of it was corroborated through independent source information, information obtained from public databases, law enforcement investigations, controlled buys, and physical and electronic surveillance.  To my knowledge, CHS-4's information has not been found to be false or misleading.

27.     **CHS-5** is an SNM gang member and was made a member while incarcerated within the BOP. CHS-5 recently began providing information to the FBI, although I had spoken with CHS-5 a number of times over the past few years. During my previous conversations with CHS-5, CHS-5 was polite and respectful, but declined to assist the FBI. CHS-5 recently began providing information to the FBI after CHS-5 spoke with other SNM members and learned several government witnesses were being targeted for execution. CHS-5 had not previously worked with law enforcement and does not have any pending criminal matters. Although CHS-5 is a member of the SNM, I tend to view CHS-5 as a "citizen informant," as CHS-5 only came forward to prevent violent crime. Moreover, the information CHS-5 provided to the FBI could be viewed as a

statement against interest, as CHS-5 attended SNM meetings discussing the gang's reorganization. I believe such meetings constitute an overt act in furtherance of RICO conspiracy. CHS has never cooperated with law enforcement or corrections officers, has never received any form of compensation, and appears to be motivated solely by civic responsibility. CHS-5 has prior felony convictions for burglary, aggravated battery, aggravated burglary, possession of a controlled substance and being a felon in possession of a firearm. I believe CHS-5's information to be reliable, as CHS-5 is taking an enormous personal risk by betraying the SNM and talking to the FBI. To my knowledge, CHS-5's information has not been found to be false or misleading.

28.     **CHS-6** is an SNM gang member and was made a member while incarcerated within the NMCD. CHS-6 began cooperating with the FBI a few years ago. CHS-6 provided background information about the membership, structure, and customs of the SNM, as well as identified individuals believed to be members or associates of the SNM. CHS-6 wore a covert recording device inside a prison facility on behalf of the FBI to collect valuable evidence. CHS-6 has testified in federal court on numerous occasions as a government witness. CHS-6 has felony convictions for murder, armed robbery, aggravated battery, burglary, trafficking a controlled substance, and possession of a controlled substance. CHS-6 has received approximately $8,000 in financial assistance[5] from the FBI. I found information from CHS-6 to be reliable because much of it was corroborated by independent source information, other law enforcement investigations, controlled drug buys, and physical and electronic surveillance. To my knowledge, CHS-6's information has not been found to be false or misleading.

---

[5] Financial assistance includes general payments, moving expenses, and fuel for the CHS's vehicle during operation support to the FBI.

## FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

29.     **Background Information:** Over the 18 months, FBI agents have been investigating a group of subjects in Albuquerque, New Mexico, and elsewhere, who are suspected of being affiliated with racially motivated violent extremists' groups and involved in drug distribution and firearms trafficking. Based on information collect thus far, the drug trafficking scheme appears to originate in Arizona, where drug traffickers obtain methamphetamine, fentanyl pills, and other drugs from the Sinaloa Cartel. From there, members of the drug trafficking organization drive the illicit drugs to Albuquerque, where they are sold for a higher price.

30.     FBI agents have been monitoring the activities of the group via social media, CHS, cooperating defendants, pen register trap and trace devices, recorded jail/prison calls, and other methods. Thus far, the target subjects appear to be affiliated through their collective drug trafficking activities and allegiance to drug trafficking gangs, to include the 23 Boyz, Soldiers of Aryan Culture (SAC),[6] Aryan Warriors (AW),[7] AB, and Albuquerque based WSL and Los

---

[6] The Soldiers of Aryan Culture (SAC) is a large white supremacist prison gang. Initially based in Utah, SAC has since spread across the nation, having members in several states as well as the federal prison system. The SAC operate both inside and outside prison walls. According to the Southern Poverty Law Center, SAC members rose through the ranks by committing violence against Hispanic and Black inmates. Once new members are accepted into the gang, they receive a SAC "patch" (tattoo) of the group's insignia: a swastika interwoven with an Iron Cross – sometimes accompanied by the initials "SAC". There also exist special patches for certain deeds, such as the SS bolts. Unlike most other white supremacist prison gangs such as the Aryan Brotherhood and the Nazi Low Riders, the SAC are strongly anti-Semitic. The SAC engages in a number of different illicit activities, such as: murder; assault; robbery; extortion; firearms trafficking; and drug distribution.

[7] The Aryan Warriors (AW) are a longstanding race-exclusive prison gang based in the Nevada prison system. The AW have operatives in both the prison system and the Las Vegas community. Orders to street-based members to commit the crimes the syndicate is known for trickle to the outside from imprisoned leaders behind bars. The AW are focused on drug trafficking, racketeering, and murder. Members bear tattoos consisting of the gang's name or initials, Viking imagery and Nazi symbols such as swastikas and lighting bolts.

Padillla's gangs. Over the past several months, FBI agents have executed numerous search and/or arrest warrants on members and associates of the aforementioned gangs, which resulted in supplementary information about the overall conspiracy, to include Defendants1-10, described below.

**Defendant 1:** On April 22, 2021, I obtained a criminal complaint and arrest warrant for AB member Jeffrey Scott MOORE, aka: "Scooter," for unlawful flight from prosecution related to a New Mexico state parole warrant. MOORE was subsequently located and arrested, during which agent's recovered information regarding AB activities in New Mexico.

31.    **Defendant 2:** On June 7, 2021, FBI agents and Bernalillo County Sheriff's Office (BCSO) detectives executed a federal search warrant on the residence of AB associate Kevin RANGEL, aka: "Wacko," in the San Jose neighborhood of Albuquerque. RANGEL was arrested on a federal warrant for being a felon in possession of a firearm, Case No. 21MJ743. During a search of RANGEL's residence, investigators located and seized five firearms, 15, 050 blue fentanyl M-30 pills, 12.5 pounds of heroin, 2.5 pounds of methamphetamine, 60 pounds of marijuana, $13,651 in U.S. currency, one ballistic vest, and several cell phones. Case agents developed information indicating the drugs had recently been transported from Arizona to RANGEL's residence by a driver that worked for the Sinaloa Cartel. Agents also discovered information linking RANGEL to the AB in New Mexico, as well as the AB Texas (ABT) prison gang.

32.    **Defendant 3:** On July 8, 2021, BCSO and FBI agents executed a search warrant on the residence of Rod WHITE in Albuquerque. During a search of the residence, investigators seized a pound of methamphetamine, several fentanyl pills, bulk U.S. currency, and information indicating the methamphetamine was being supplied by white gang members in Arizona and California.

33.    **Defendant 4:** Between July 16-22, 2021, Richard WHEELER, aka: "Fat Jesus," a

suspected Bandidos Outlaw Motorcycle Club prospect and AB associate, sold methamphetamine to an undercover FBI task force officer on three occasions. I subsequently obtained an arrest warrant for WHEELER, which charged him with three counts of methamphetamine distribution and armed drug trafficking. New Mexico State Police (NMSP) agents subsequently observed WHEELER at a local casino and arrest him. During a search of WHEELER's Mercedes SUV, agents located two pistols and a large bag of fentanyl pills. The ensuing investigation yielded additional information about the AB and Peckerwoods in New Mexico.

34.     **Defendant 5:** On July 29, 2021, FBI agents executed a federal search and arrest warrant on the residence of Russell WHEELER in Los Lunas, New Mexico. Russell WHEELER was a suspected AB associate and the uncle of Richard WHEELER (Subject 4). Russell WHEELER was wanted for being a felon in possession of a firearm, which related to an earlier shooting, Case No. 21MJ962. During a search of the residence, agents located an active methamphetamine lab, 12 gauge sawed-off shotgun, and an AR-15 rifle. Russell WHEELER's residence had several white power images (swastika, lightning bolts, 14/88, etc.) painted on the walls. Agents developed information indicating Russell WHEELER was not only cooking methamphetamine, but also processed bulk liquid methamphetamine into a solid state, for a suspected member the Sinaloa Cartel.

35.     **Defendant 6:** On August 9, 2021 FBI agents executed federal search warrants on two residences associated with Eddie TRUJILLO, aka: "Taz," a career criminal from Nevada. The search warrant was obtained after TRUJILLO sold heroin and guns to a CHS. Additionally, multiple CHS reported TRUJILLO was a gun source of supply to the AB and SNM. Additional source information indicated TRUJILLO was storing several firearms at a storage unit in Albuquerque. Agents located $50,000 in cash and a loaded AR-15 in TRUJILLO's primary

residence. TRUJILLO was located at his girlfriend's residence a short time later and arrested. During a search of TRUJILLO's girlfriend's apartment agents found additional bulk currency and a loaded pistol. TRUJILLO was in possession of several storage locker keys, but failed to cooperate with agents.

36.    **Defendant 7:** On August 23, 2021, U.S. Probation Officers requested FBI assistance after they located 25 firearms and thousands of rounds of ammunition inside a storage facility being rented by federal probationer Shiloh MCLEMORE, of Arizona. FBI agents suspected the storage shed may have been connected to TRUJILLO, and responded to the location. Agents recovered the firearms and subsequently charged MCLEMORE with being a felon in possession of firearms and ammunition. MCLEMORE claimed the firearms were family heirlooms from his grandfather; however, several were determined to be stolen, while others had been manufactured much later than MCLEMORE's grandfather could have acquired them.   Agents subsequently learned the process by which recently released BOP inmates, releasing to the District of New Mexico are gang affiliated.

37.    **Defendant 8:** On November 4, 2021, FBI agents arrested Shawn NORTON, aka: "Rotten," in Las Vegas, New Mexico, for being a felon in possession of a firearm. NORTON is a member of the Mongols Motorcycle Club (MMC) in Nevada; however, recently moved to Albuquerque. FBI agents also executed a search warrant on NORTON's person to collect his DNA and photograph is tattoos. In addition to several MMC tattoos, NORTON had several skinhead and white power gang tattoos. FBI and DEA sources have reported the MMC, which exist in multiple states, to include Arizona and New Mexico, have been distributing Sinaloa Cartel sourced drugs for several years. I do not currently have any CHS who have reported such activity, but believe the information to be plausible given the historical criminal proclivity of both organizations.

38.    **Subject 9:** On December 16, 2021, FBI and DEA agents executed a federal search warrant on the residence of Crystal MASCARENAS, aka: "Sassy," in Albuquerque. During a search of the residence, agents located four firearms, over a pound of fentanyl pills, nearly a pound of methamphetamine, an ounce of heroin, and bulk currency. Agents developed information indicating Shamon PACHECO Jr., aka: "Stunner," had been at the residence the night before and dropped the firearms off. Additional intelligence information indicated MASCARENAS had been selling drugs with Defendants 2, 3 and 4 in the months prior.

39.    **Defendant 10:** On February 18, 2022, FBI agents arrested AB associate Martin STUMPF, aka: "German," on a federal warrant for being a felon in possession of a firearm. Agents had previously developed information STUMPF was affiliated with the AB, had transported drugs from the U.S.-Mexico border to Albuquerque, and was recruiting younger skinheads into his crew. The NMCD previously classified STUMPF as a suspected member of the Arizona AB. In reviewing STUMPF's background, I learned STUMPF ran the NMCD Level 6 (maximum security) facility when he was incarcerated. In fact, STUMPF was disciplined by the NMCD for running the white inmates on the yard and instigating violence. STUMPF remains in federal custody and the investigation is ongoing.

40.    **The Current Investigation:** Case agents developed important information via the aforementioned investigations, which remain ongoing. With regard to the instant request for search warrants, FBI agents are currently investigating SHAMON PACHECO JR, aka: "STUNNER," FNU LNU, aka: "JUNIOR," RAY LEE BROWN, STEVEN MICHAEL PANHORST, aka: "CHAOS," JAMES CASADY CANGRO, aka: "HAVIC," LARRY DWAYNE DAUGHERTY, aka: "GUNNER," and others. In the paragraphs that follow, I have outlined the general premise of the investigation.

Page 20

**The Arizona to New Mexico Drug Trafficking Organization**

41.     CHS-2 is a member of a DTO that also employees PACHECO, JUNIOR, BROWN, PANNHORST, and others, and facilitates drug shipments from gang members in Arizona to gang members in New Mexico. CHS-2 provided details on the inner workings of the DTO. The DTO primarily deals in methamphetamine and fentanyl pills known as "blues" or "M30s," both of which are manufactured and imported into the U.S. by the Sinaloa Cartel. Members of the Arizona AB and Trigger Boys gangs obtain methamphetamine from the cartel for about $750 a pound, and blues for $.85 cents each. CHS-2 explained, "There are homeless guys in Phoenix, who don't even have shoes or anything else, slanging blues for a dollar a pill. We had to push east to Albuquerque to make money." CHS-2 went on to describe Albuquerque as being a "neutral" or "unregulated" by organized crime and open for business. CHS-2 said Albuquerque did not have a gang that regulated who sold in the city or taxed the dealers that did, thus outside organizations could come in and sell drugs uninhibited by a dominant organized crime element.

42.     CHS-2 went on to explain the Arizona 23 Boys were sending methamphetamine and fentanyl to bulk dealers in Albuquerque. CHS-2 said the arrangement had been in existence for at least a year. CHS-2 identified the DTO members and their roles in the organization.

43.     The 23 Boyz worked with a member of the Trigger Boys named "BENZO" to acquire lower priced dope from the cartel. BENZO also had distributors in Albuquerque that represented the Westside Locos (WSL) and Los Padilla's (LosPa) gangs. The 23 Boyz had connections to several white power affiliated gang members in New Mexico.

44.     CHS-2 reported the primary WSL connect was Shamon PACHECO Jr., aka: "Stunner," and the primary LosPa connect was Ray Lee BROWN. CHS-2 indicated PACHECHO was a solid distributor and had several lower-level WSL dealers under him. CHS-2 provided a detailed

description of PACHECO's residence within the San Jose neighborhood of Albuquerque, PACHECO's vehicles, distribution patterns, and information on his family, to include grandmother, father (who is an SNM member), girlfriend and twin daughters.

45.     CHS-2 identified JUNIOR as a G-Town gang member who worked with PACHECO and lived above PACHECO's residence. JUNIOR's cousin, FNU LNU, aka: "STRETCH" was reportedly a shot caller within the G-Town gang and also plugged into the same Sinaloa Cartel connections.

46.     CHS-2 reported Steven PANNHORST to be a validated member of the 23 Boyz gang. CHS-2 said PANNHORST was the principal point of contact between the Arizona and New Mexico gangs. According to CHS-2, PANNHORST was in Albuquerque on dozens of occasions in recent weeks conducting business for the DTO. PANNHORST delivered drugs and collected money owed to the DTO. CHS-2 said PANNHORST often drove a load vehicle to Albuquerque and then flew on a private airplane back to Arizona.

47.     A review of PANNHORST's Facebook pages confirmed his presence in Albuquerque, in different vehicles, and at least on one occasion he flew in a private aircraft. In a Facebook post dated March 7, 2022, PANNHORST is depicted driving a vehicle with a New Mexico temp tag in the rear window and holding bulk currency.



48.     In the Facebook post below, dated March 9, 2022, PANNHORST is depicted driving a Range Rover in New Mexico. PANNHORST commented in the post, "Nice day to push the range rover… got more whips (cars) than most have kicks (shoes)."



49.     Below: Facebook video post dated February 28, 2022, depicting PANNHORST flying on a private aircraft from NM to AZ.

## Videos

### Steven's Videos




50.     CHS-3 previously sold drugs for PACHECO and reported PACHECO sold methamphetamine, fentanyl, and possessed several firearms. CHS-3 described PACHECO as a skillful drug dealer with connections to the SNM and Burqueños prison gangs, and most of the Albuquerque street gangs. CHS-3 indicated PACHECO had a Mexican plug (source of supply) in Arizona that sent large quantities of drugs to PACHECO on a consistent basis.

51.     CHS-5 reported PACHECO and a gangster from Arizona were living in the San Jose neighborhood and moving a lot of dope and guns. CHS-5 said everyone was aware of the fact that PACHECO had dope and money, and some of the SNM members were discussing doing a home invasion robbery on PACHECO.

52.     CHS-6 reported PACHECO had a solid drug connection in Arizona and had been moving significant amounts of methamphetamine and pills. CHS-6 said PACHECO was supplying the San Jose, WSL, and Los Padillas gangs. CHS-6 said the SNM weren't dealing with PACHECO because his dad (a SNM member) was locked up and PACHECO Jr. had paperwork (had cooperated with law enforcement in the past).

### Debt Collection and a Murder Contract

53.     CHS-2 reported a Sinaloa Cartel member known as ANGEL requested PACHECO and JUNIOR attempt to collect $96,000 from Los Padillas member Ray Lee BROWN in mid-March 2022. BROWN owed the money to the DTO for drugs received and was behind on payments. ANGEL requested PACHECO and JUNIOR kill BROWN if he failed to turn over the money. ANGEL indicated the cartel would pay the men in dope for killing BROWN. According to CHS-2, PACHECO, JUNIOR, PANNHORST, and several WSL members went to BROWN's apartment in Albuquerque. PANNHORST made contact with BROWN inside the residence, while PACHECO, JUNIOR, and two additional car loads of WSL members waited nearby. PACHECO

and JUNIOR were armed with Drako AK-47 pistols.  CHS-2 said PANNHORST served as a spokesperson for the DTO and negotiated with BROWN. PANNHORST was able to collect $25,000 from BROWN and related his efforts to ANGEL or another representative of the cartel. PANNHORST was then authorized to provide BROWN with four pounds of methamphetamine so BROWN could earn more money. As of the writing of this affidavit, I believe BROWN remains in debt and may be subject to cartel discipline. I also believe PACHECO, JUNIOR, PANNHORST, and BROWN possess evidence of the past and present conspiracy to either collect drug money from BROWN, or murder BROWN.

54.     In the Facebook 2020 photo below, BROWN is wearing a Pittsburg Pirates ballcap, which Los Padillas gang members have adopted to represent the "Padillas" gang. The photo on the right depicts tattoos on BROWN's back, to include "Padillas,"



55.     In the 2019 Facebook photos below, PACHECO claims to be New Mexican made and a legend. The photo on the right depicts a tattoo on PACHECO's left hand, which reads "Stunner."



### Firearms Trafficking:

56.     CHS-2 reported PACHECO, JUNIOR, and BROWN frequently sent firearms to Arizona to be provided to the cartel. The person collecting the firearms is known as BENZO and he ships them to Mexico via the Port of Entry at Nogales, Arizona. BENZO also sent ammunition to Mexico. CHS-2 said the Sinaloa Cartel people would pay $1,500 per AK-47 or AR-15 rifle, or trade 2 pounds of meth or 2,000 fentanyl pills per rifle. CHS-2 said PANNHORST and the AB also traded guns for dope. The AB didn't mind providing guns to the cartel as long as the guns were used in Mexico.

57.     CHS-3 reported PACHECO is always armed and has access to numerous firearms.

58.     CHS-5 reported PACHECO and an individual from Arizona were moving a lot of dope and guns.

### James Casady CANGRO:

59.     In February 2022, CHS-1 reported James Casady CANGRO, aka: "Havic," was involved in drug distribution, unlawful firearms possession and other criminal activity. CHS-1 advised CANGRO is paranoid, using steroids (and methamphetamine on occasion), and usually armed with a black semi-auto handgun.

60.     Based on information from CHS-1, I began researching CANGRO and discovered he was

dating and living with Laura Michelle CRISTY at 3413 Ross Avenue SE, #D, Albuquerque, New Mexico. Law enforcement and court records indicated CRISTY was on federal probation for human trafficking (Case No. EP-19-CR-01284-DCG-2). While researching CANGRO and CRISTY, I learned that on September 3, 2021, United States Probation Office (USPO) officers conducted a search of the CANGRO/CRISTY residence. The search was predicated on the fact that USPO officers believed CRISTY was using drugs, living with CANGRO (a violent felon), and in violation of the terms of her supervised release. Moreover, USPO officers received information from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) indicating CANGRO and others had been involved in home-invasion type robberies in which the men pretended to be police officers.

61.    USPO officers made contact with CRISTY prior to the search and advised her they were coming.[8] USPO officers subsequently arrived at the location and made contact with CRISTY and CANGRO. Two Bernalillo County Sheriff's Office (BCSO) detectives were present during the search, both of whom recorded the incident on their body worn cameras. USPO officers searched the residence and located the following contraband during the search: a backpack full of THC products, $1,000 in U.S. currency, handcuffs, a black ballistic vest with a dagger in the chest plate area, two glass methamphetamine pipes, anabolic steroids, a Glock pistol magazine loader, two packages of syringes, a switchblade knife, and one Samsung Galaxy cellular telephone that contained photos of a large quantity of currency and a Taurus pistol.

---

[8] I believe one or more firearms may have been removed from the premises prior to the arrival of USPO officers. My belief is based on the fact that USPO officers called ahead of their visit, CRISTY and CANGRO are convicted felons, and officers subsequently found a Glock pistol magazine loading device, a ballistic vest, and handcuffs inside the home. Moreover, CRISTY's cell phones contained photos of a black pistol.

Page 27



*The items seized by USPO*

62.     During a post-Miranda interview, CANGRO told BCSO detectives the ballistic vest, knives, and handcuffs belonged to him. He initially said he had used the vest while serving as a wildland fire fighter. He later said he purchased the vest for protection because someone had shot at his vehicle. He did not mention being employed in a job that required the vest.

63.     This conduct was reported to the Western District of Texas, where CRISTY'S jurisdiction originates for initiation of violation proceedings, due to the violations of her supervised release. CRISTY continued to display non-compliant behavior, and in November 2021, two more cellphones were removed from her possession, following her termination from a halfway house. CRISTY was subsequently arrested and remains in custody.  USPO officers seized all of the evidence items listed above and maintained custody of them.

### Search Warrant on Cristy's Cell Phones

64.     On March 9, 2022, I obtained a U.S. District Court search warrant to examine CRISTY's three cell phones, Case No. 22MR399.  FBI agents were able to access two of the three phones and reviewed the contents. There were numerous communications between CHRISTY and CANGRO, as well as photos of a pistol, CANGRO with bulk currency, and CANGRO displaying

his SAC tattoos. I am including these because I think they corroborate the initial information the FBI received from the CHS concerning CANGRO's criminal activities.





**Cangro in Possession of a Firearm and Controlled Substances**

65.     Within the past three days, CHS-1 communicated with CANGRO and learned CANGRO had a 9mm pistol for sale. CHS-1 expressed an interest in the pistol and the conversation is on-going. CANGRO indicated he had access to additional firearms. CANGRO also told CHS-1 that CANGRO had blues (fentanyl pills) for sale and was getting them from Arizona (delivered to Albuquerque) for $2 per pill. CANGRO told CHS-1 to let him know if CHS-1 needed fentanyl.



66.     Above: CANGRO's New Mexico driver's license photo. Note the tattoo above his right eye "188%," which is indicative of 100% white power and 88 refers to Heil Hitler ("H" being the 8th letter in the alphabet).



67.     Above: U.S. Bureau of Prisons photo of CANGRO with tattoos of the letters "SAC" on lower stomach and SAC symbol above that – red swastika and blue iron cross.[9]

### Drugs into New Mexico and Arizona Prisons

68.     CHS-2 reported PANNHORST was smuggling Suboxone, heroin, and miniature cellular telephones into 23 Boyz at the Arizona prison in Buckeye. CHS-2 said PANNHORST had been getting about 100 Suboxone strips and a few grams of heroin into the facility on a weekly basis, via personal visits.  PANNHORST utilized women smuggle the dope into the prison during in-

---

[9] Hitler reinstated the Iron Cross as a purely German decoration in 1939 during Nazi domination of German politics and government. It had previously been a military award of the Kingdom of Prussia.

person visits with members of the 23 Boyz.  Validated 23 Boyz member "D2K" (Down to Kill) was in charge of the drug distribution on the inside. CHS-2 also knew PANNHORST to have sent at least two miniature cell phones into the Buckeye facility via the same scheme.



*Example cell phone photos.*

69.     CHS-4 reported Aryan Warrior member Larry Dwayne DAUGHERTY, aka: "Gunner," was distributing Suboxone strips, heroin, and fentanyl pills at the Northeastern New Mexico Correctional Facility (NENMCF) in Clayton, New Mexico. CHS-4 had previously been part of an Albuquerque based DTO with DAUGHERTY, who mostly dealt in methamphetamine.  CHS-4 and DAUGHERTY had worked together to smuggle drugs into the Bernalillo County Metropolitan Detention Center (MDC) when DAUGHERTY had been housed there a couple of years ago. CHS-4 said two Peckerwoods, one from Albuquerque and one from Santa Fe, had been sending DAUGHERTY drugs on an alternating basis. CHS-4 was with the Albuquerque Peckerwood on two occasions within the past month when the Peckerwood mailed DAUGHERTY fake legal mail containing several Suboxone strips.

70.     According to CHS-4, the most recent drug shipment to DAUGHERTY occurred within the past four days. I am unsure how long it takes postal mail to travel from Albuquerque to Clayton, New Mexico. I am aware Suboxone strips are highly sought after in the prison system and I believe DAUGHERTY will be in possession of Suboxone, as well as evidence of his drug trafficking activities.

71.    The jail booking photos below depicted DAUGHERTY's tattoos - "**88**" represents "HH" or Heil Hitler, and lightning bolts.



72.    As previously mentioned, this affidavit is being submitted for six search warrants to collect evidence, fruits, and instrumentalities of violations of federal drug trafficking, firearms, and racketeering laws, as well as aid the FBI in the disruption and dismantlement of several drug supply houses within Albuquerque.

73.    All of the Target Subjects are habitual offenders with lengthy criminal histories. All of the Target Subjects on the street are believed to be in possession of firearms and ammunition, which I believe are being used in furtherance of their drug trafficking crimes.

74.    While I believe the Target Subjects are engaged in a conspiracy to distribute controlled substances, I do not assert all of the Target Subjects are plotting, conspiring or coordinating drug trafficking activities with one another directly. I do believe the bulk of the drugs being distributed by the Target Subjects is sourced by cartel representatives in Arizona. The requested search warrants are not the result of a large, singular, DTO investigation; rather, the Target Subjects are connected to each other in that they are each connected to racially motivated violent extremists' groups and are sourced, in part, by the Sinaloa Cartel.

75.    I have observed some of the Target Subjects to be supportive of one another, with mutual

acquaintances, while others may not know each other or may be competitors; yet all share a nefarious business model and geographic similarity.

76.    In the pages that follow, I have sought to identify the Target Subjects in greater detail, noted whether they are suspected members of any gangs, and described their roles in the Target Offenses. I have included the arrest history of the Target Subjects, and where possible, noted the offenses for which they were convicted.

## THE TARGET SUBJECTS

77.    **Target Subject 1** SHAMON PACHECO Jr, aka: "STUNNER," is a suspected Westside Locos street gang member and has at least 15 prior arrests in New Mexico. PACHECO has felony convictions for possession with intent to distribute a controlled substance, aggravated fleeing a law enforcement officer, and trafficking a controlled substance. PACHECO is the son of Shamon PACHECO Sr., aka: "Bullet," a validated member of the SNM, who your affiant arrested on federal firearm charges last year.

78.    **Target Subject 2** FNU LNU, aka: "JUNIOR," is believed to be a member of the G-Town gang from Glendale, Arizona, and currently living in Albuquerque assisting the DTO distribute methamphetamine and fentanyl.

79.    **Target Subject 3** STEVEN MICHAEL PANNHORST, aka: "CHAOS," is a validated member of the 23 Boyz prison gang in Arizona and is currently in custody at MDC on an Arizona felony warrant for absconding from supervision. PANNHORST has 14 prior arrests in Arizona with felony convictions for robbery, kidnapping and identity theft.

80.    **Target Subject 3** RAY LEE BROWN is a suspected member of the Los Padilla's gang in Albuquerque and has 15 prior arrests in New Mexico and one in Arizona. BROWN has felony convictions for armed robbery, breaking and entering, trafficking a controlled substance, false

imprisonment, and burglary. BROWN is currently pending charges in Scottsdale, Arizona, for drug possession for sale (4-counts), possession of a firearm by a prohibited person, and possess/use a weapon during the commission of a drug trafficking offense, Case No. SCT22-02114.

81.    **Target Subject 4** JAMES CASADY CANGRO, aka: "HAVIC," is a validated Soldiers of Aryan Culture prison gang member who admitted to possessing a ballistic vest despite having been convicted of violent felonies, apparently contrary to 18 U.S.C. § 931. CANGRO has at least six prior arrests in Utah and Oklahoma with prior convictions for robbery, aggravated assault and firearm related charges. CANGRO has a prior federal conviction for 18 U.S.C. § 924(c) use of a firearm in furtherance of a drug trafficking crime, case No. 04-CR-00339-DB.

82.    **Target Subject 5** LARRY DWAYNE DAUGHERTY, aka: "GUNNER," is a validated Aryan Warrior prison gang member from Nevada with at least 27 prior arrests in Nevada, California, and New Mexico. DAUGHERTY has felony convictions for discharging a firearm at or into a structure, aggravated burglary, possession of a controlled substance, resisting arrest with a weapon, battery, domestic violence battery, burglary and assault with a deadly weapon. DAUGHERTY has a pending case in the 2nd Judicial District of New Mexico for possession of a dangerous weapon (a shank), while confined at MDC in 2019, Case No. D-202-CR-2019-02794. DAUGHERTY has an active arrest warrant out of San Diego, California, for probation violations, Case No. CR-13-2558.

## THE SUBJECT PREMISES

83.    **Subject Premises A-1:** I believe SHAMON PACHECO, aka: "STUNNER," lives at Subject Premises A-1, located at 240 Wheeler Avenue SE, 1st floor, unit A, Albuquerque, New Mexico. Subject Premises A-1 may be described as a two-story residence, divided into four units, with brown siding and brown trim. A brick and iron fence enclose the property. There are cameras

positioned on all sides of the residence. The numbers 240 are posted on the mailbox in front of the residence. The letter A is posted above the front door, which consists of a white metal security door in front of a standard, inward opening, front door. A color photograph of the Subject Premises has been attached and incorporated in Attachment A.

Indicia of Residence

a) Surveillance agents have observed PACHECO enter and exit the residence.

b) PACHECO's black Mercedes Benz had been parked in the driveway each time surveillance agents drove by the location.

c) PACHECO's girlfriend, AG, is listed in public databases as living at the location. I am aware PACHECO and AG shared three prior addresses.

d) CHS-2, CHS-5, and CHS-6 reported PACHECO lives at the Subject Premises.

84.     **Subject Premises A-2:** I believe FNU LNU, aka: "JUNIOR," lives at Subject Premises A-2, located at 240 Wheeler Avenue SE, 2nd floor, unit B, Albuquerque, New Mexico. Subject Premises A-2 may be described as a two-story residence, divided into four units, with brown siding and brown trim. A brick and iron fence enclose the property. There are cameras positioned on all sides of the residence. The numbers 240 are posted on the mailbox in front of the residence. The letter B is posted on the front door of the Subject Premises. A color photograph of the Subject Premises has been attached and incorporated in Attachment A.

Indicia of Residence

a. CHS-2 has visited JUNIOR at Subject Premises A-2 on more than thirty occasions and knows JUNIOR to live there.



Locations A-1 and A-2 are located at the same property. The photograph above indicates the respective front doors of the locations.

85.     **Subject Premises A-3:** I believe RAY LEE BROWN, lives at Subject Premises A-3, located at 3900 Tulane Drive NE, unit 27, Albuquerque, New Mexico. Subject Premises A-3 may be described as a two-story apartment complex with tan and orange colored siding. The name of the apartment complex is listed at the entrance to the property, "Theta Apartments" with the number 3900.  There are cameras positioned on all sides of the complex and one directly over Subject Premises A-3.  The number 27 is posted on the front door of Subject Premises A-3. A color photograph of the Subject Premises has been attached and incorporated in Attachment A.

        Indicia of Residence

                a)  Surveillance agents have observed BROWN enter and exit the residence.

                b)  CHS-2 visited BROWN at the Subject Premises on numerous times in recent
                    weeks and reported BROWN lives there.

86.     **Subject Premises A-4:** I believe JAMES CASADY CANGRO, aka: "HAVIC," lives at Subject Premises A-4, located at 3413 Ross Avenue, unit D, Albuquerque, New Mexico. Subject Premises A-4 may be described as a single story apartment complex with red brick siding. The numbers 3413 are posted at the front of the building and the letter D is posted on the front door of

the residence. There are cameras positioned on all sides of the building and one directly next to the front door of Subject Premises A-4. A color photograph of the Subject Premises has been attached and incorporated in Attachment A.

Indicia of Residence

a) USPO officers and BCSO detectives previously contacted CANGRO at the residence.

b) Official law enforcement records indicate the Subject Premises is CANGRO's residence.

c) Surveillance agents have observed CANGRO enter and exit the residenc

87.    **Subject Premises A-5:** I am aware that LARRY DWAYNE DAUGHERTY, aka: "GUNNER," is an inmate at the Northeastern New Mexico Correctional Facility in Clayton, New Mexico (Subject Premises A-5). NMCD officials have confirmed DAUGHERTY is currently living in housing unit 1, pod A-204. NMCD officials will assist the FBI in serving the search warrant on DAUGHERTY's prison cell and property within the cell.

88.    **Subject Premises A-6:** I am aware that STEVEN MICHAEL PANNHORST, aka: "CHAOS," is an inmate at the Metropolitan Correctional Center in Albuquerque, New Mexico. MDC officials have confirmed PANNHORST is currently living in housing unit Fox 6, cell 14. MDC officials will assist the FBI in serving the search warrant on PANNHORST's jail cell and property within the cell.

## SEARCHING FOR GANG TATTOOS:

89.    When the search warrants are executed, agents will attempt to interview the Target Subjects about their gang membership. I believe gang tattoos to be significant evidence of gang affiliation and such tattoos may constitute an overt act, in-so-much-as gang-specific tattoos enable

a person to maintain or increase their position within the gang. I have successfully charged multiple gang members with overt acts, within the context of a RICO conspiracy, for having one or more gang specific tattoos.

90.     It has been my experience that many people lie when speaking with law enforcement and will sometimes go to great lengths to conceal their gang ties.   Furthermore, the persons to be searched may exercise their constitutional right to refrain from speaking with law enforcement agents. In an effort to discern and document the Target Subject's gang affiliation, I am requesting law enforcement agents be permitted to search the Target Subject's bodies (all are male subjects), above the waist and below the thighs, for tattoos.

91.     I am aware that the 23 Boys, SAC, AW, AB, WSL, and LP often have distinct tattoos that represent their dedication to their respective criminal enterprises. Members display these tattoos to gain respect within the enterprise and to intimidate non-members. I am seeking the court's permission to utilize law enforcement photographers to photograph and document the Target Subject's tattoos. Such photo documentation would help positively identify subjects and better document and determine their gang affiliation.

92.     Law enforcement and corrections department records that I have reviewed in this case indicate that all of the male Target Subjects have one or more tattoos on their bodies.  I believe the male Target Subjects may have gang related tattoos.

93.     **EXHIBIT 1,** which is attached hereto, contains several examples of 23 Boyz, SAC, AW, AB, WSL, and LP gang tattoos.

## BIOMETRIC ACCESS TO DEVICES

94.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly

newer mobile devices, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

95.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

96.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

97.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises

by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

98.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

99.     As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

100.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days.

Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device may exist for only a short time.

101.    Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request permission to: (1) press or swipe the fingers (including thumbs) of the TARGET SUBJECTS to the fingerprint scanner of the devices found at the Subject Premises; (2) hold the devices found at the Subject Premises in front of the face of the TARGET SUBJECTS and activate the facial recognition feature; and/or (3) hold the devices found at the Subject Premises in front of the face of the TARGET SUBJECTS and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to request that the TARGET SUBJECTS state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask the Target Subjects to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## **REQUEST FOR NIGHT TIME SERVICE:**

102.    I am requesting the Court authorize the FBI to serve these warrants prior to 6:00 a.m., as set forth under Fed. R. Crim. Proc. 41(e) (2) (A) (ii).  Agents and officers will be attempting to serve the requested search warrants in closely coordinated and simultaneous raids. FBI SWAT teams have been briefed on this operation and will be utilized to execute the search warrants. Meanwhile, the target subjects located at CNMCF and MDC will be searched by corrections

officials. I am requesting the Court authorize the FBI to serve the requested search warrants for a number of factors:

    a) the search warrants will need to be executed in a closely coordinated and simultaneous sequence;

    b) the locations and persons to be searched are located in different parts of the city;

    c) many of the Subject Premises are believed to be equipped with cameras;

    d) firearms are believed to be present at the subject's residences;

    e) the majority of the Target Subjects have extensive criminal histories.

    f) many of the Subject Premises are located near schools and/or school bus stops and I would like to avoid school-age children congregating around bus stops or otherwise traveling toward schools. I believe many of the schools in the targeted areas start as early as 7:45 a.m.

103. Therefore, I am requesting authorization to serve the requested search warrants at any time of the day or night. With the Courts authorization, I will instruct FBI SWAT teams to begin serving the requested search warrants as early as 4:00 a.m.

Page 42

**CONCLUSION:**

104.    Based on the foregoing, I believe that there is probable cause to believe that evidence of violations of 21 U.S.C. §§ 841(a), 843(b), 846, 856, and 18 U.S.C. §§ 922(g)(1), 924(c), and 1962, as more particularly described in Attachment B will be found at the Subject Premises and on the Target Subjects.   Therefore, I submit that this affidavit supports probable cause for warrants to search the premises described in Attachment A and seize the items described in Attachment B. This affidavit was reviewed by Assistant United States Attorney Paul Mysliwiec of the District of New Mexico.

Respectfully submitted,

Bryan M. Acee
FBI Special Agent

Electronically submitted and telephonically sworn to me on April__4th__, 2022.

Jerry H. Ritter
United States Magistrate Judge
District of New Mexico

Attachment:  **EXHIBIT 1**, containing relevant sample gang tattoos.

## EXHIBIT 1

### EXAMPLE GANG TATTOOS

**23 BOYZ**

  

**SOLDIERS OF ARYAN CULTURE**

 

**ARYAN WARRIOR**

 

Page 44

**ARYAN BROTHERHOOD**

  

**WESTSIDE LOCOS**



**LOS PADILLAS**

